UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JUSTIN ROOSMA and ELIZABETH ROOSMA,<br><br>Plaintiff,<br><br>v.<br><br>PIERCE COUNTY, CORRECT CARE SOLUTIONS LLC, PAUL PASTOR, and PATTI JACKSON-KIDDER,<br><br>Defendants. | CASE NO. 3:16-cv-05499-RJB<br><br>ORDER ON PIERCE COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

THIS MATTER comes before Court on the Motion for Summary Judgment of Defendants Pierce County, Sheriff Paul Pastor, and Chief Patti Jackson-Kidder (Pierce County Defendants). Dkt. 102. Plaintiffs and Defendant Correct Care Solutions, LLC (CCS) filed Responses, Pierce County Defendants filed a Reply, and Defendant CCS filed a Surreply. Dkts. 131, 134, 142, 149. The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file herein. No party requested oral argument.

The outcome of this motion, and ultimately entirety of this case, rests on the showing by Plaintiffs' counsel. While Plaintiffs may have constructed a plausible case theory, Plaintiffs needed to counter Defendants' motion with evidence showing issues of material fact. Instead,

- 1

Plaintiffs submitted an incomplete showing on the most necessary of elements or relied on bare representations by counsel. The Federal Rules of Civil Procedure orient this Court towards resolving cases on their merits, but the Court can only consider the record submitted. Plaintiffs have failed to meet their burden. As discussed below, the claims against Pierce County Defendants should be dismissed, Pierce County Defendants' cross-claim should be remanded, and any pending motions should be stricken as moot.

## I.   BACKGROUND

**A.  The record considered.**

Pierce County Defendants have incorporated the Statement of Facts as set out in Defendant CCS' Motion for Summary Judgment. Dkt. 102 at 2. *See* Dkt. 90. Pierce County Defendants have supplemented the record in two respects: (1) with facts relevant to the two individually named defendants, Paul Pastor and Patti Jackson-Kidder, and (2) with facts relevant to a contract dispute between Defendant Pierce County and Defendant CCS ("the Pierce County/CCS contract"), which is the subject of a cross-claim by Pierce County Defendants against Defendant CCS.

Plaintiffs' Response refers to no declarations, deposition transcripts, a sworn complaint, or other attachments, but the pleading states an intent to incorporate facts by reference. Dkt. 134 at 2. *See* Dkt. 134 at 4-10. This appears to be reliance by Plaintiffs on the record submitted by the defendants, as well as the record submitted by Plaintiffs in their Response to Defendant CCS' Motion for Summary Judgment. *See* Dkts. 108, 110, 112.

Pierce County Defendants' Reply further supplements the circumstances surrounding the Pierce County/CCS contract with declarations. Dkts. 144, 145, 146. Defendant CCS, in its Surreply, moves to strike portions of the declarations and related arguments. Dkt. 149.

**B. Underlying incident facts.**

Because Plaintiffs have not further supplemented the record, facts recited do not substantively differ from those in the Court's prior Order. *See* Dkt. 127.

This case centers on an injury to Plaintiff Justin Roosma while in custody at Pierce County Jail in mid-2014. Mr. Roosma was medically screened at Pierce County Jail on April 28, 2014. Dkt. 81-1 at 4. A Screening Questionnaire signed by Mr. Roosma and a nurse states that Mr. Roosma "does not know names of medications." *Id*. at 4-6. Correct Care Solutions faxed a medical release and medication verification form to Rite Aid Pharmacy, which returned the request as "Not verifiable." *Id*. at 9. After visiting with a mental health provider, Mr. Roosma was given two anti-depressants, Norvasc and Effexor. *Id*. at 14. Mr. Roosma was released on bail on May 3, 2014. *Id*. at 21. Mr. Roosma maintains that he was released after having two seizures, caused by an abrupt stop of medications. Dkt. 110 at 3.

Mr. Roosma was again booked into Pierce County Jail on June 17, 2014. Dkt. 81-1 at 25. A second Screening Questionnaire noted that Mr. Roosma currently takes medication but does not specify the type. *Id*. at 28. A second medication verification form completed by Rite Aid Pharmacy noted a 60-day prescription on June 10, 2014 for Mirapex, a drug prescribed for Restless Leg Syndrome. *Id*. at 33. The medication verification form also confirmed other then-current prescriptions, including Prilosec (gastrointestinal) and Effexor (antidepressant). *Id*.

A June 21, 2014 healthcare request, or "kite," requested "meds" because "I'm really sick due to not having them." Dkt. 81-1 at 37. Following a second kite, on June 23, 2014, Mr. Roosma received treatment for gastrointestinal issues. *Id*. at 39, 40.

On June 26, 2014, Mr. Roosma sent a third kite, stating, "I have a severe case of RSP [*sic*] (Restless Leg Syndrome) . . . I take Maripax [*sic*] everyday I can't sleep or rest due to pain

from it[.]" Dkt. 81-1 at 45. A signed response by a nurse notes, "Seen 6/27/14." *Id*. The same nurse's handwritten notes reflect a June 27, 2014 discussion of Mirapex and a fax to St. Clare Hospital for release of Mr. Roosma's "RLS + shoulder pain" records. *Id*. at 49, 51.

On July 7, 2014, Mr. Roosma sent a fourth kite. "I was seen about a week ago for my meds . . . I take Maripax [*sic*] for Restless Leg and I haven't had my meds [and] they are current[.]" Dkt. 81-1 at 54. Mr. Roosma met with a nurse on July 9, 2014 and began taking some medications. *Id*. The Medication Administration Record, a medical log of medicine given to Mr. Roosma, reflected administration starting on either July 9 or 10, 2014 of Lopid (cholesterol), Effexor (antidepressant), Niaspan (cholesterol), and Prilosec (gastrointestinal medication). Dkt. 117-1 at 20; Dkt. 81-1 at 58.

On July 11, 2014, Mr. Roosma sent a fifth kite, stating, "I've sent a couple kites out to find out about my Restless Leg medication "MeriPex" [*sic*] could you Please let me know what the hold up is. I would like to sleep." Dkt. 81-1 at 60. The comments portion of the kite stated, "Seen 7-14-14. Medication not being filled at this time per Carver ARNP." *Id*.

On July 12, 2014, Mr. Roosma sent a sixth kite, stating, "I'm kicking in my sleep! When I sleep, I'm hurting my toes and there [*sic*] bleeding all over my sheets. . . I really need my RLS MeriPex [*sic*] to sleep." Dkt. 81-1 at 62. The comments portion, signed by a nurse, stated, "appointment already scheduled." *Id*. Another kite, sent on either July 10, 2014 or July 18, 2014, stated, "I think I broke my foot from kicking in my sleep do [*sic*] to my RLS Restless Leg. I want my Meripex [*sic*] I'm really hurting[.]" *Id*. at 64. The unsigned comment section read, "Seen." *Id*.

On July 21, 2014, at approximately 3am, Mr. Roosma fell from the top bed bunk onto the floor. Mr. Roosma was alone in the room. Mr. Roosma states that he "did not go to sleep until

very late" because "they did not allow me to take the Mirapex[.]" Dkt. 110 at 10. Mr. Roosma represents that at some point prior to the fall, he had asked an unidentified person if could sleep on a lower bunk, but "they would not grant me one." *Id*. at 8.

Mr. Roosma states that he is "sure it was my restless leg syndrome (RLS) that caused me to fall out of bed . . . because after going into custody and being cut off of the Mirapex I started feeling the familiar symptoms, severe pain in my legs." Further, he recalls, "a few days before the fall I had actually suffered injury to my foot and toes kicking the wall in my sleep, [which] leaves no doubt in my mind it was my RLS that caused the fall." Dkt. 110 at 6.

When asked at his deposition about self-diagnosing his own medical issues, Mr. Roosma agreed with opposing counsel that he "do[es] not have any medical training that would permit [him] to personally diagnose or treat any serious medical or mental health issues," Dkt. 78 at 4, although, he maintains, he is "at the worst end of the range of symptoms" for a person with Restless Leg Syndrome. Dkt. 110 at 11. A doctor first diagnosed Mr. Roosma with the condition in 2008, when he was first prescribed Mirapex, which made a difference "like night and day." *Id*. at 8; Dkt. 108-9 at 9. Mrs. Roosma also noticed a difference after Mr. Roosma began taking Mirapex, observing that Mirapex "was a godsend . . . There was no more thrashing [and] [s]udden leg movement ceased." Dkt. 112 at 3. Since first being prescribed Mirapex, Mr. Roosma reports, his doctor has increased dosage from 1mg to 3mg per day. Dkt. 110 at 10. *But compare to* Dkt. 108-9 at 2, 8, 9 (.50 mg and .25mg).

After the fall incident, Mr. Roosma was transported first to Tacoma General Hospital, then to Harborview Medical Center. Dkt. 110 at 8. Mr. Roosma maintains that he broke his eye socket, suffered a concussion, broke his wrist, and had to have twenty-two stiches on his knee. *Id*. at 9. A radiology report dated July 21, 2014, concludes that an x-ray "showed no fractures

besides the left orbital roof." Dkt. 81-1 at 80, 82. According to the Medication Administration Record, Mr. Roosma was administered Mirapex from July 22, 2014 until July 24, 2014. Dkt. 117-1 at 20. It appears that a single person authorized administration of all medicine for Mr. Roosma. Dkt. *Id*. According to RN Jonathan Slothower, the nurse on duty when Mr. Roosma fell from his bed, inmates are given medication when "medically necessary," a determination made by a doctor or nurse practitioner. *Id*. at 9, 20.

Defendant CCS' expert witness, Dr. Scott Bonvallet, medical director of Overlake Sleep Disorders Center, is familiar with distinctions between Restless Leg Syndrome and obstructive sleep apnea. Based on his review of Mr. Roosma's medical records, Dr. Bonvallet has concluded that Mr. Roosma's Restless Leg Syndrome "was not the cause of, or even a contributor to, his falling out of bed." Dkt. 80 at 3. According to Dr. Bonvallet, the condition "does not cause individuals to fall out of bed, as the movements are quite subtle[,]" and the "limb twitching/awakenings from RLS occur during the first few hours of sleep . . . [but] Mr. Roosma fell out of bed at approximately 0300, making it very unlikely that his fall was caused by RLS." *Id*. He opines that "there are much more probable explanations to include [Mr. Roosma's] severe obstructive sleep apnea, known history of sleep walking, or he simply fell out of bed." *Id*.

In Mrs. Roosma's experience, "sleep apnea never arose as a practical problem causing restlessness[.]" Dkt. 112 at 3. Mr. Roosma acknowledges his diagnosed sleep apnea, but Mr. Roosma had not been using the "CPAP," a respiratory ventilation to aid with sleep apnea, "because I was sleeping so well from the Mirapex." Dkt. 110 at 10. Mrs. Roosma confirms that Mr. Roosma tried a CPAP without success, but Mirapex "profoundly" helped his RLS symptoms, "from mild irritation to severe kicking." Dkt. 112 at 4.

Dr. Bonvallet has also concluded that it was reasonable and within the standard of care for the jail medical providers to not prescribe Miramex. Dkt. 80 at 5. According to Dr. Bonvallet, "I understand that there are substantial reasons to restrict access to such medication in the setting of jail[,]" and "there were no foreseeable medical risks through its discontinuance[.]" *Id.*

**C. Defendant Pastor and Defendant Jackson-Kidder facts.**

At the time of the fall incident, Defendant Jackson-Kidder worked for Pierce County as the Prison Rape Elimination Act Coordinator/Medical liaison, where she was responsible to serve as a liaison between Pierce County Jail and medical providers "with regard to any issues that arose out of their performance of the contract." Dkt. 104 at ¶6. Defendant Jackson-Kidder was "unaware of Justin Roosma as an inmate in the jail" and "made no decision and took no actions regarding his medical care." *Id.* at ¶8. At that time, she also lacked "authority to supervise, direct or order the activities of CCS employees." *Id.* at ¶6. In September of 2015, Defendant Jackson-Kidder transitioned to become the Chief of Corrections for Pierce County Sheriff's Department in September of 2015. *Id.* at ¶1.

Defendant Pastor, Pierce County Sheriff, delegated the responsibility to "prepare and pursue a contract for medical services" to Julie Williams, Defendant Pastor's Chief of Staff to Defendant Pastor. Ms. Williams executed the task "in consultation with other individuals who had relevant specialized knowledge[.]" Dkt. 103 at ¶9. She represents that, on behalf of Pierce County, Defendant Pastor was not the sole signatory to the Pierce County/CCS contract. *Id.* at ¶15. *See id.* at 5.

**D. Claims[1] and cross-claim.**

---

[1] Plaintiffs filed a Second Motion for Leave to File First Amended Complaint on February 15, 2018. Dkt. 135. The matter is not yet ripe for review.

The Complaint alleges two claims under 28 U.S.C. §1983. Count One has been dismissed without prejudice as to all defendants, Dkt. 29 at 12, and Count Two is alleged only against Defendant Pastor and Defendant Jackson-Kidder. Dkt. 1 at ¶5.8.

The Complaint alleges three claims for discrimination, for violations of the Americans with Disabilities Act, Count Three; §504 of the Rehabilitation Act, Count Four; and the Washington Law Against Discrimination (WLAD), RCW 49.60.30, Count Five. Dkt. 1 at ¶¶5.13-5.29. Common to all three discrimination claims is the allegation that the defendants, including Pierce County Defendants, discriminated against Plaintiff Justin Roosma by failing to accommodate a disability. *See id*. Against Pierce County Defendants the Complaint also alleges common law claims of negligence and intentional infliction of emotional distress, in Count Six and Count Seven, respectively. *Id*. at ¶¶5.30-5.37.

Pierce County Defendants allege a cross-claim for breach of contract against Defendant CCS. Dkt. 30 at ¶¶3.1-3.7. *See* Dkt. 103 at 5. The cross-claim alleges that Pierce County and CCS entered into a contractual agreement in early 2014 that included an indemnification provision holding harmless Pierce County for acts by CCS and its agents. *Id*. The cross-claim seeks specific performance for provisions of a Personal Services Agreement, a document incorporated by the Pierce County/CCS contract, as well as recovery of costs and fees incurred from CCS' breach of contract. *Id*. The Pierce County-CCS contract is also the subject of a lawsuit filed on February 9, 2017 by Defendant CCS against Pierce County Defendants in Pierce County Superior Court. Dkt. 146 at ¶2. *See* Pierce Cty. Sup. Ct. Cause No. 17-2-06200-1.

**E. Procedural history.**

Pierce County Defendants filed the Motion for Summary Judgment on January 25, 2018. Dkt. 102.

The Court issued an Order on Defendant CCS' Motion for Summary Judgment on February 8, 2018. Dkt. 127. The Order dismissed all of Plaintiffs' claims against Defendant CCS, but did not dismiss Defendant CCS because of the pending cross-claim by Pierce County Defendants. Dkt. 127 at 20. The Order also dismissed unnamed John Doe defendants. *Id*. at 127 at 10, 11.

Pierce County Defendants filed their Motion for Summary Judgment on January 25, 2018. Dkt. 102. The motion seeks summary judgment of dismissal for Plaintiffs' claims and judgment in Pierce County Defendants' favor for their cross-claim.

Trial is scheduled for March 5, 2018. Dkt. 88.

II.     DISCUSSION

**A. Summary judgment standard.**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c).The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56 (d). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, T.W. *Elect. Service Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

**B. Sec. 1983 claims (Count One and Count Two)**

The Complaint alleges two claims for constitutional deprivations under §1983, Count One and Count Two. The Court previously dismissed Count One without prejudice "as to all defendants" for failure to state a claim. Dkt. 29 at 12.

Count Two is alleged "As To DEFENDANTS PASTOR, JACKSON-KIDDER, and DOES 101-500[.]" Dkt. 1 at 13. The Court previously dismissed all unnamed John Doe defendants. Dkt. 127 at 10, 11. Defendant Pierce County is not a named defendant in Count Two.

The remaining two Pierce County Defendants, Defendant Pastor and Defendant Jackson-Kidder, are shielded from damages for civil liability by qualified immunity if their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "What this means in

practice is that whether an official protected by qualified immunity may be held personally liable . . . generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time[.]" *Wilson v. Layne*, 526 U.S. 603, 614 (1999) (internal quotations omitted). In analyzing a qualified immunity defense, the Court must determine: (1) whether a constitutional right would have been violated on the facts alleged, taken in the light most favorable to the party asserting the injury; and (2) whether the right was clearly established when viewed in the specific context of the case. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts are "permitted to exercise sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first[.]" *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The majority of Plaintiffs' §1983 argument is recitation of case law. *See* Dkt. 134 at 10-22. The most cogent theory to be extracted from the remainder would appear to be that the defendants acted with deliberate indifference to Mr. Roosma's serious medical need by intentionally insulating themselves from making any day to day medical decisions affecting inmates, including Mr. Roosma. *See id*. According to Plaintiffs, the defendants did this by, *inter alia*, contracting out medical services to CCS, a corporation likely to harm inmates, and instituting a "circular" medical grievance process. *See id*.

While this may be a cogent theory, it is disconnected from the conduct of each defendant actually found in the record. Regarding Defendant Jackson-Kidder, the record confirms her role as Chief of Corrections for Pierce County Sheriff's Department in September of 2015, but this case arose out of conduct in mid-2014. Dkt. 104 at ¶1. At that time, Defendant Jackson-Kidder worked as the Prison Rape Elimination Act Coordinator/Medical Liaison, where she was responsible to serve as a liaison between Pierce County Jail and medical providers "with regard

to any issues that arose out of their performance of the contract." *Id*. at ¶6. However, Defendant Jackson-Kidder was "unaware of Justin Roosma as an inmate in the jail," "made no decision and took no actions regarding his medical care," and at that time lacked "authority to supervise, direct or order the activities of CCS employees." *Id*. at ¶¶6, 8.

Regarding Defendant Pastor, Defendant Pastor's Chief of Staff, Julie Williams, states that Defendant Pastor "delegated to me the responsibility to prepare and pursue a contract for medical services[,]" a task she executed "in consultation with other individuals who had relevant specialized knowledge[.]" Dkt. 103 at ¶9. She represents that, on behalf of Pierce County, Defendant Pastor was not the sole signatory to the Pierce County/CCS contract. *Id*. at ¶15. *See id*. at 5.

None of the above facts—which are the only facts shown that could possibly connect Defendant Jackson-Kidder and Defendant Pastor to Plaintiffs' theory—point to objectively unreasonable conduct. Nor do these facts support Plaintiffs' theory, because the mere fact that the defendants worked in supervisory roles does not result in individual liability, and to the extent Plaintiffs would seek damages from the defendants because of their supervisory roles, such a claim would fail. *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989). Plaintiffs have not pointed to any other facts in the record specific to Defendant Jackson-Kidder and Defendant Pastor. Dkt. 134.

Because Defendant Jackson-Kidder and Defendant Pastor are shielded by qualified immunity, Pierce County Defendants' motion for summary judgment should granted as to Count Two, which should be dismissed against Defendant Jackson-Kidder and Defendant Pastor.

**C. ADA and Rehabilitation Act claims (Count Three and Count Four)**

Plaintiffs argue that their ADA and Rehabilitation Act claims are based "not in the denial of medical treatment, but in the denial of a reasonable accommodation." Dkt. 134 at 23. According to Plaintiffs, Pierce County Defendants failed to make two reasonable accommodations, where they failed to provide Mr. Roosma with Mirapex for his Restless Leg Syndrome and prohibited him from sleeping on the bottom bunk. *Id*.

The Court rejected this argument when made against Defendant CCS. Dkt. 127 at 13. The failure to give Mr. Roosma medication and permission to sleep on a bottom bunk can be analogized to other situations that did not give rise to a claim for disability discrimination, such as a diabetic requesting a special diet, *Reyes v. Ryan*, 2009 WL 10677722, at *2 (D. Ariz. 2009), *aff'd.*, 424 F. App'x 659 (9th Cir. 2011), or an inmate requiring outdoor recreation to prevent depression, *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010). In such cases, courts have observed the bedrock rule that the statutory protections from disability discrimination extend only to "prohibit[] discrimination *because of* disability, not inadequate treatment *for* disability." *Simmons*, 609 F.3d at 1022 (emphasis added), citing to *Bryant*, 84 F.3d at 248-249 ("[T]he [ADA] would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners[.]"). Plaintiffs have presented no basis to depart from this axiom.

Even if the facts could give rise to ADA and Rehabilitation Act claims, Plaintiffs have offered no basis in the record to hold each of the three Pierce County Defendants liable. Plaintiffs argue that "the Sheriff's Office and either [Defendant] Jackson or [Defendant] Pastor could have given the order . . . [but] [i]nstead, they all deferred, by policy to CCS." [*sic*] Dkt. 134 at 23. From context, it appears that "the order" Plaintiffs believe should have given by Pierce County Defendants was for Mr. Roosma to receive medication and be assigned to a bottom bunk.

*See id*. However, neither Defendant Jackson-Kidder nor Defendant Pastor were aware of Mr. Roosma's condition, and at least Defendant Jackson-Kidder lacked authority to order medical care by CCS. Dkt. 104 at ¶¶6, 8. There is not a sufficient showing for individual liability for Pierce County Defendants to create an issue of material fact for the ADA and Rehabilitation Act claims.

Pierce County Defendants' motion for summary judgment should granted as to Count Three and Count Four, which should be dismissed against Pierce County Defendants.

**D. Washington Law Against Disability (WLAD) claim (Count Five).**

Plaintiffs appear to have abandoned this claim against Pierce County Defendants. *See* Dkt. 134.

The Court previously dismissed this claim against Defendant CCS because the WLAD has not yet been applied to jails and Plaintiffs made no showing that Mr. Roosma's treatment by Defendant CCS was caused by his disability. Dkt. 127 at 14, 15. There is no apparent reason to depart from this reasoning when applied to Pierce County Defendants, especially where there is no record that Pierce County Defendants were involved with Mr. Roosma's medical care.

Pierce County Defendants' motion for summary judgment should be granted as to Count Five, which should be dismissed against Pierce County Defendants.

**E. Negligence (Count Six)**

Plaintiffs argue that Pierce County Defendants allowed a situation "to exist and metastasize resulting in great potential for harm," where there was a "blanket refusal to treat any sleep disorders . . . and by refusing the reassignment to a lower bunk[.]" Dkt. 134 at 24. Plaintiffs have not pointed to any place in the record for such a "blanket" policy by CCS. *Id*. at 8, ¶23; Dkt. 113 at 9, ¶7. But even if CCS had such a policy, Plaintiffs' theory is a medical negligence claim

by another name, with an expansive theory of liability extended to Pierce County Defendants. Finding Pierce County Defendants liable for "allowing this situation to exist and metastasize" would depend on the sufficiency of CCS' medical care. However, the Court previously dismissed the Negligence claim against Defendant CCS, finding no issue of material fact as to whether Defendant CCS' medical care fell below the standard owed. Dkt. 127 at 15, 16. Therefore, the Negligence claim against Pierce County Defendants should also be dismissed.

Pierce County Defendants' motion for summary judgment should be granted as to Count Six, which should be dismissed against Pierce County Defendants.

**F.  Intentional Infliction of Emotional Distress/Outrage (Count Seven)**

Under Washington law, the tort of Outrage requires proof of three elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of severe emotional distress. *Reid v. Pierce County,* 136 Wn.2d 195, 202 (1998). Whether certain conduct is sufficiently outrageous is ordinarily for the jury, but it "is initially for the court to determine if reasonable minds could differ." *Dicomes v. State,* 113 Wn.2d 612, 630 (1989). The conduct "must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Grange Ins. Ass'n v. Roberts*, 179 Wn.App. 739, 754 (2013).

Plaintiffs summarily introduce three theories of outrageous conduct: (1) the "policies of not exercising due diligence in vetting CCS [as contractor for medical services at Pierce County Jail], (2) not supervising or monitoring its medical contractor [CCS], and (3) not allowing inmates a means to have their grievances heard." Dkt. 134 at 23 (numeration added). The first theory fails because Plaintiffs have made no showing, with admissible evidence that Pierce

County Defendants failed to exercise due diligence when executing the Pierce County/CCS

contract. Beyond the representations of counsel[2] about the number of cases lodged against CCS,

Plaintiffs have made no showing as to what Pierce County Defendants knew about CCS when

executing the contract. The unrefuted showing is that Pierce County Defendants exercised due

diligence. *See* Dkt. 103.

Plaintiffs' second theory fails on account of Plaintiffs' failure to identify how each of the

three named Pierce County Defendants failed to supervise or monitor CCS, because it is unclear

what conduct Plaintiffs believe to be outrageous, and the conduct that is shown does not amount

to outrage under *Grange Ins. Ass'n (supra)*. The third theory relies on a supposed policy "of not

allowing inmates a means to have their grievances heard," but this theory is only substantiated by

the representations of Plaintiffs' counsel, *see* Dkt. 134, p. 8 at ¶¶25, 26, which is insufficient, nor

does the purported policy amount to outrage under *Grange Ins. Ass'n (supra)*.

Pierce County Defendants' motion for summary judgment should granted as to Count

Seven, which should be dismissed against Pierce County Defendants.

**H. Cross-claims of Pierce County Defendants.**

Because all of Plaintiffs' claims have been dismissed, the only pending claim is Pierce

County Defendants' cross-claim against Defendant CCS. Pierce County Defendants request

summary judgment in their favor, that the Court find Pierce County to be contractually

indemnified by Defendant CCS for the acts of CCS and its agents. Dkt. 102 at 18-21.

---

[2] Plaintiffs rely on a statistic about the number of times CCS has been named as a defendant in other lawsuits. Dkt. 134 at 5, ¶4. This number appears to be based on Plaintiffs' counsel's research. Even if the Court took judicial notice of that number, there is no showing of which cases were pending at the time of the contract execution, or whether the cases have merit. Plaintiffs elsewhere cite to "Slothower Dep. 30:15-25" for a similar proposition, *see* Dkt. 134 at 10, but Plaintiffs did not attach the cited portion of the deposition their pleadings. *See* Dkt. 108-2.

Pierce County Defendants and Defendant CCS agree that the contract at issue in the cross-claim is also at issue in a Pierce County Superior Court lawsuit, but they disagree about what should be done. Pierce County Defendants argue for a stay of the Pierce County case pending resolution of the cross-claim by this Court, because this case was first-filed, this Court is more familiar with the underlying claims, and resolving the merits of the cross-claim would have a preclusive effect on the state court claims. Dkt. 143 at 6. Defendant CCS seeks dismissal of the cross-claim because it is duplicative of the state court case, and allowing both cases to proceed would be impermissible claim splitting. Dkt. 131 at 7, 8.

The Pierce County/CCS contract is the primary focus of the Pierce County Superior Court case, whereas in this case, the same contract was peripheral to the pleadings. The Court respectfully declines to exercise its supplemental jurisdiction over Pierce County Defendants' cross-claim. *See* 28 U.S.C. §1367(c)(3).

The request by Pierce County Defendants for summary judgment on their cross-claim should be denied without prejudice. The cross-claim should be remanded to the Pierce County Superior Court.

**I. Other pending matters.**

Because all claims by Plaintiffs have been dismissed and Pierce County Defendants' cross-claim remanded, all other pending matters should be stricken as moot.

\* \* \*

Therefore, it is **HEREBY ORDERED** that:

(1) The Pierce County Defendants' Motion for Summary Judgment (Dkt. 102) is

HEREBY GRANTED IN PART and DENIED IN PART, as follows:

**A. Plaintiffs' claims:**

- ▪ <u>Sec. 1983 claims (Count One, Count Two)</u>: The request to dismiss Count One is denied as moot. *See* Dkt. 1; Dkt. 29. The request to dismiss Count Two is denied as moot as to Defendant Pierce County. The request to dismiss Count Two as to Defendant Jackson-Kidder and Defendant Pastor is granted and the claim dismissed.

- ▪ <u>ADA claim (Count Three)</u>: Granted. This claim is dismissed against Pierce County Defendants.

- ▪ <u>Rehabilitation Act claim (Count Four)</u>: Granted. This claim is dismissed against Pierce County Defendants.

- ▪ <u>WLAD claim (Count Five)</u>: Granted. This claim is dismissed against Pierce County Defendants.

- ▪ <u>Negligence (Count Six)</u>: Granted. This claim is dismissed against Pierce County Defendants.

- ▪ <u>Outrage (Count Seven)</u>: Granted. This claim is dismissed against Pierce County Defendants.

**B. Pierce County Defendants' cross-claim against Defendant CCS:**

- ▪ The request for summary judgment in favor of Pierce County Defendants for their cross-claim against Defendant CCS is denied without prejudice.

(2) The Court declines to exercise its supplemental jurisdiction over the sole remaining claim in the case, the state law cross-claim of Pierce County Defendants against Defendant CCS. The case is HEREBY REMANDED to the Pierce County Superior Court. This Court makes no findings about the merits of the cross-claim.

(3) All other remaining motions are HEREBY STRICKEN as moot.

(4) The Pretrial Hearing and Trial dates are HEREBY STRICKEN.

This case is HEREBY DISMISSED.

IT IS SO ORDERED.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

Dated this 21st day of February, 2018.

ROBERT J. BRYAN
United States District Judge